IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No.  5:08-CV-595-FL

| | | |
|---|---|---|
| MAE AYSCUE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings. [DE's 19-20, 22-23]. The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter is before the undersigned for the entry of a Memorandum and Recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings [DE-19] be DENIED, that Defendant's Motion for Judgment on the Pleadings [DE-22] be GRANTED, and that the final decision by Defendant be AFFIRMED.

## Statement of the Case

Plaintiff applied for Disability Insurance ("DIB") on June 7, 2005 and Supplemental Income Benefits ("SSI") on May 20, 2005, alleging that she became unable to work on April 18, 2002. (Tr. 18). This application was denied initially and upon reconsideration. (Tr. 18). A hearing was held before an Administrative Law Judge ("ALJ"), who found Plaintiff was not disabled during the relevant time period in a decision dated December 7, 2007. (Tr. 18-30). The Social Security

1

Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on October 29, 2008, rendering the ALJ's determination as Defendant's final decision. (Tr. 9-12). Plaintiff filed the instant action on December 4, 2008. [DE-5].

## Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## Analysis

The Social Security Administration has promulgated the following regulations which

2

establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (Tr. 20). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) hypertension; 2) diabetes mellitus; 3) asthma; 4) chronic obstructive pulmonary disease ("COPD"); 5) a history of carpal tunnel syndrome; 6) degenerative joint disease of the left knee; 7) obesity; 8) an affective disorder; and 9) anxiety disorder. (Tr. 20-21). In completing step three, however, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was not able to perform her past relevant work as a nurse assistant. (Tr. 28). At step five, based on the testimony of a vocational expert ("VE"), the ALJ found that there were jobs that Plaintiff could perform and that these jobs existed in significant numbers in the national economy. (Tr. 29).

3

Accordingly, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. (Tr. 29-30). In making these determinations the ALJ cited substantial evidence, a summary of which now follows.

On January 14, 2000 was admitted to Maria Parham Hospital in Henderson, North Carolina with complaints of shortness of breath. (Tr. 183). After hospitalization, Plaintiff was given various intravenous medications and was also placed on a albuterol plus Atrovent nebulization. (Tr. 183). Plaintiff developed chest pains on January 15, 2000 and was given nitroglycerin for relief. (Tr. 183). After this treatment, Plaintiff did not suffer any subsequent chest pain during her hospitalization. (Tr. 183). During her hospitalization, Plaintiff's "blood sugar varied from 150 to 190". (Tr. 183). Ultimately, Plaintiff was discharged on January 18, 2000. (Tr. 183). At the time of her discharge, it was noted that Plaintiff "was doing quite well clinically." (Tr. 183). She was discharged on a prednisone taper. (Tr. 184). Dr. An-Po Chiang diagnosed Plaintiff with: 1) chronic obstructive pulmonary disease/asthmatic bronchitis, with acute exacerbation resolving; 2) tobacco abuse; and 3) a history of angina. (Tr. 184).

Plaintiff was admitted to Maria Parham Hospital on November 28, 2000. (Tr. 186). She was diagnosed with: 1) COPD with acute exacerbation; 2) right middle lobe/right lower lobe acquired pneumonia; 3) tobacco abuse; 4) diabetes; 5) hypertension; and 6) a history of sinus problems. (Tr. 186). By December 1, 2000 it was observed that Plaintiff "was doing much better clinically" and she was discharged on that day. (Tr. 186).

Dr. Imre Gaal, Jr. noted on May 13, 2001 that Plaintiff had no edema. He also concluded that Plaintiff had low lung volumes with bibasilar atelectasis. (Tr. 192). In addition, on July 22, 2001, Dr. J. Mark Spargo concluded that Plaintiff had a "[s]mall linear scar or area of subsegmental

atelectasis in the right lung base . . . [but] [n]o acute cardiopulmonary disease." (Tr. 199).

On August 24, 2001, Plaintiff was admitted to Maria Parham Hospital complaining of shortness of breath and chest tightness. (Tr. 203). She was diagnosed with: 1) chronic obstructive pulmonary disease/asthmatic bronchitis with acute exacerbation; 2) diabetes; and 3) hypertension. (Tr. 204). Plaintiff was "feeling much better clinically" on August 25, 2001 and was discharged. (Tr. 203). Upon discharge, Plaintiff was "urged to continue smoking cessation and follow a low salt . . . 1800 calorie diet." (Tr. 204).

A report dated November 3, 2001 indicated that no free air, masses, or organomegaly were seen. (Tr. 225). Likewise, no renal caculi or cholelithiasis were noted. (TR. 225). A moderate amount of stool was located throughout Plaintiff's colon. (Tr. 225). Otherwise, Plaintiff's bowel gas pattern was unremarkable. (Tr. 225).

Plaintiff was admitted to Maria Parham Hospital on December 22, 2001 complaining of chest pain and epigastric discomfort. (Tr. 229). Upon examination, it was noted that Plaintiff had "fair control of her blood sugar, ranging from 120 to 160 at home." (Tr. 232). She was not in distress. (Tr. 232). Plaintiff was diagnosed with: 1) coronary artery disease, status post myocardial infarction, age undetermined; 2) gastroesophageal reflux; 3) non-insulin-dependent diabetes; 4) hypertension; 5) allergic sinusitis; and 6) asthma. (Tr. 229). On December 24, 2001, Plaintiff was stable and discharged. (Tr. 229).

Another report dated December 22, 2001 found borderline cardiomegaly. (Tr. 239). However, there was no evidence of cardiopulmonary disease. (Tr. 239). Plaintiff's lungs were clear and visualized osseous structures were unremarkable for Plaintiff's age. (Tr. 239). Furthermore, a cardiolite stress rest test conducted on December 24, 2001 indicated that Plaintiff had "[r]elatively

large areas of fixed decreased activity in the anterior and inferior walls which are compatible with infarct." (Tr. 238). There was no definite evidence of ischemia. (Tr. 238).

On April 19, 2002, Plaintiff underwent a release of left hand carpal tunnel procedure. (Tr. 262). There were no complications during this procedure and Plaintiff was taken to the recovery room in good general condition. (Tr. 262). Likewise, on May 28, 2002, Plaintiff underwent a release of right hand carpal tunnel procedure. (Tr. 268). Once again, there were no complications during this procedure and Plaintiff was taken to the recovery room in good general condition. (Tr. 268).

Dr. Imre Gaal, Jr. stated on June 19, 2002 that Plaintiff was mildly kyphotic. (Tr. 282). He also indicated that "[t]here is no scarring or atelectasis in the lung bases bilaterally . . . [and] [n]o infiltrates or edema." (Tr. 282). Another study was conducted on July 28, 2002. (Tr. 290). This study indicated that Plaintiff's heart size was normal. (Tr. 290). Dr. Joseph Melamed concluded that "[b]ibasilar streaky opacities are present which appear to represent scarring or subsegmental atelectasis . . .[t]he lungs are otherwise clear." (Tr. 290).

Plaintiff underwent a cardiolite stress test on September 25, 1998. (Tr. 325). She was able to exercise for a total of three minutes and 31 seconds. (Tr. 325). During this exercise, Plaintiff's did not reach 85% peak maximum heart rate. (Tr. 325). Dr. Susan Kennedy stated that "[t]here is a small fixed defect in the anterior wall of the left ventricle, which is most consistent with a small area of infarction . . . [t]here is no evidence of reversible ischemia." (Tr. 325). Ultimately, Dr. Kennedy concluded that the "exam was limited as the patient did not reach 85% of her peak maximum heart rate." (Tr. 325).

On March 22, 2001, Dr. John Sierra reviewed a radiograph of Plaintiff's chest. (Tr. 324).

Plaintiff's bones and soft tissues were unremarkable. (Tr. 324). Likewise, her heart size and pulmonary vascularity were normal. (Tr. 324). Finally, her lungs were free of active disease. (Tr. 324).

A June 6, 2001 noninvasive cardiovascular laboratory indicted that Plaintiff's sinus rhythm was normal. (Tr. 316).

Dr. Willie J. Sessions[1] examined Plaintiff on October 2, 1998 and noted that Plaintiff was "feeling better." (Tr. 307). On March 12, 1999, Dr. Sessions indicated that Plaintiff was capable of working, although she needed to "refrain from heavy lifting, or any exertional activities on the job." (Tr. 305). Again on December 14, 2000, Dr. Sessions stated that Plaintiff "may go back to work." (Tr. 300). Specifically, Dr. Sessions noted that Plaintiff's complaints had improved. (Tr. 300). After examinations conducted on January 2, 2001 , March 21, 2001, and January 15, 2003 Plaintiff's complaints were described as "stable." (Tr. 293-299). Likewise, after examinations conducted on August 20, 2001 and November 21, 2001 Plaintiff's complaints were described as "improved." (Tr. 295-297).

Upon examination on May 11, 2001, May 22, 2001, and July 20, 2001 Plaintiff had: 1) a regular rate and rhythm; 2) no murmurs, rubs or gallops; and 3) no cyanosis, clubbing or edema in her extremities. (Tr. 397-403). On June 8, 2001, Dr. Charlie Foster opined that "excessive lifting greater than 15 to 20 pounds, excessive stooping or bending will cause worsening of palpitations and increased [chances] of the patient developing angina." (Tr. 400). He also recommended that Plaintiff be permitted to sit down when she develops chest discomfort. (Tr. 400). However, Dr.

---

[1] The undersigned notes that the ALJ stated the following: "[t]he record includes medical source statements from Drs. Sessions and Foster which predate the claimant's alleged onset date and are, therefore, given no weight." (Tr. 27).

Foster also indicated that Plaintiff's hypertension and heart condition were under fairly good control. (Tr. 400). Examination on February 27, 2002 indicated that Plaintiff had: 1) a regular rate and rhythm; 2) no murmurs, rubs or gallops. (Tr. 387). Dr. Foster stated on March 18, 2002 that Plaintiff's "[h]ome blood sugars [were] running well, ranging from 89-114." (Tr. 386).

The results of a LifeLine Screening examination were interpreted by Dr. David Countryman on February 14, 2003. (Tr. 328-330). Specifically, Dr. Countryman stated that: 1) the results of Plaintiff's carotid artery screening fell within the normal range; 2) no abdominal aortic aneurysm was detected; and 3) Plaintiff's peripheral arterial disease screening results were normal. (Tr. 328-330).

On May 12, 2003, Dr. Phillip Pretter reviewed an x-ray of Plaintiff's chest. (Tr. 336). He stated that there was no evidence of acute infiltrate, effusion, or edema. (Tr. 336). Plaintiff's heart size was also within normal limits. (Tr. 336). However, Dr. Pretter did note mild degenerative changes within Plaintiff's thoracic spine. (Tr. 336). Ultimately, Dr. Pretter concluded that there was no evidence of acute pulmonary disease. (Tr. 336).

Another radiological exam dated May 15, 2003 revealed that: 1) Plaintiff was mildly kyphotic; 2) Plaintiff's lungs were clear; and 3) Plaintiff's heart was normally sized. (Tr. 345). Ultimately it was determined that the examination revealed no acute cardiopulmonary abnormalities. (Tr. 345).

Plaintiff underwent another radiological exam on October 12, 2003. (Tr. 365). The examination revealed that Plaintiff's heart size was normal and her lungs were clear. (Tr. 365). The pleural surfaces were smooth and there was no pleural effusion or pneumothorax. (Tr. 365).

Dr. Spargo reviewed an ultrasound of Plaintiff's abdomen on January 16, 2002. (Tr. 412).

The ultrasound was unremarkable other than status post cholecystectomy. (Tr. 412). A CT scan was performed on February 6, 2002. (Tr. 411). This scan indicated that: 1) Plaintiff was markedly obese; 2) Plaintiff's liver, spleen, and kidneys were normal; 3) Plaintiff's adrenal glands were of normal size and configuration; 4) Plaintiff's pancreas was of normal size and configuration; and 5) there was no evidence of abscess, mass, or tumor. (Tr. 411).

Plaintiff underwent an evaluation of her RFC on March 8, 2004. It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight-hour workday; 5) push and/or pull with no limitations other than those noted for lifting. (Tr. 421). No postural, visual or communicative limitations were noted. (Tr. 423-424). Her handling and fingering were described as limited. (Tr. 428). Plaintiff was instructed to avoid concentrated exposure to: 1) fumes, odors, dusts, gases, poor ventilation, etc.; and 2) hazards such as machinery and heights. (Tr. 424).

On August 25, 2004, Plaintiff underwent a psychological evaluation. (Tr. 435). Plaintiff stated that she lives by herself, although she occasionally cares for her three grandchildren. (Tr. 435). After examination she was diagnosed with: 1) major depressive disorder, single episode, mild to moderate without psychotic features-by history; and 2) borderline mental functioning. (Tr. 438). Dr. W. Jim Miller concluded that Plaintiff was able to understand, retain and follow simple instructions and to perform simple repetitive tasks. (Tr. 438). He also opined that Plaintiff would get along well with fellow workers and supervisors. (Tr. 438). Likewise, he also thought that Plaintiff could tolerate the stress and pressures associated with day-to-day work activity. (Tr. 438). Finally, he indicated that Plaintiff is capable of managing her own business affairs. (Tr. 438).

Dr. Sundar Veerappan examined Plaintiff on September 22, 2004. (Tr. 440-459). According to Dr. Veerappan, Plaintiff: 1) stated that she was not having any problems due to her diabetes; 2) had regular and normal pulse rate rhythm; 3) was not in acute distress; 4) had no cardiac murmur; 5) demonstrated diffusely normal vesicular breath sounds; 6) had no pallor or cyanosis; 7) had grip strength of 5/5 in both hands; 8) was able to grasp objects without any problems; 9) was able to walk on her heels and on her toes without much difficulty; and 10) was able to squat on the floor and get up without any difficulty. (Tr. 442-444). He also noted that Plaintiff's bronchial asthma was controlled with multiple medications with no clinical evidence of complications. (Tr. 444). Likewise, Plaintiff's symptoms of chest pain were controlled with rest without any medications. (Tr. 444). With regard to Plaintiff's carpal tunnel syndrome, Dr. Veerappan noted that Plaintiff did not demonstrate any evidence of muscle weakness. (Tr. 444). During a pulmonary function assessment, Plaintiff did not appear to be short of breath or easily fatigued. (Tr. 456). Nor did she wheeze or cough during the test. (Tr. 456).

Plaintiff's underwent a psychiatric review on September 24, 2004. (Tr. 460-485). It was determined that Plaintiff had: 1) mild restriction of activities of daily living; 2) no difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence, or pace; and 4) no episodes of decompensation of extended duration. (Tr. 470). Dr. Lori A. Brandon also opined that Plaintiff appeared capable of performing simple, routine, repetitive tasks in a low-stress setting. (Tr. 472). Likewise, Dr. Brandon also indicated that Plaintiff was capable of managing funds. (Tr. 472). In addition, Dr. Brandon stated that Plaintiff was: 1) not significantly limited in her ability to remember locations and work-like procedures; 2) not significantly limited in her ability to understand and remember very short and simple instructions; 3) moderately limited

in her ability to understand and remember detailed instructions; 4) not significantly limited in her ability to carry out very short and simple instructions; 5) moderately limited in her ability to carry out detailed instructions; 6) moderately limited in her ability to maintain attention and concentration for extended periods; 7) not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 8) not significantly limited in her ability to sustain an ordinary routine without special supervision; 9) not significantly limited in her ability to work in coordination with or proximity to others without being distracted by them; 10) not significantly limited in her ability to make simple work-related decisions; 11) moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 12) not significantly limited in her ability to interact appropriately with the general public; 13) not significantly limited in her ability to ask simple questions or request assistance; 14) not significantly limited in her ability to accept instructions and respond appropriately to criticism from supervisors; 15) not significantly limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 16) not significantly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards or neatness and cleanliness; 17) moderately limited in her ability to respond appropriately to changes in the work setting; 18) not significantly limited in her ability to be aware of normal hazzards and take appropriate precautions; 19) not significantly limited in her ability to travel in unfamiliar places; and 20) not significantly limited in her ability to set realistic goals or make plans independently of others. (Tr. 474-475). These findings were reviewed and affirmed by another physician on February 8, 2005. (Tr. 499).

On October 4, 2004, Plaintiff's physical RFC was assessed again. (Tr. 478-485). It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) about six hours in an eight hour workday; 4) sit (with normal breaks) about six hours in an eight hour workday; and 5) push and/or pull with no limitations others than those noted for lifting and carrying. (Tr. 479). No postural, manipulative, visual, or communicative limitations were noted. (Tr. 482). Plaintiff was instructed to avoid concentrated exposure to: 1) fumes, odors, dusts, gases, poor ventilation, etc.; and 2) hazards such as machinery and heights. (Tr. 482). These findings were reviewed and affirmed by Dr. Joel Dascal on February 2, 2005. (Tr. 498).

Plaintiff was admitted to Franklin Regional Medical Center on November 15, 2004 with complaints of weakness associated with palpitations. (Tr. 487-497). Plaintiff denied any lightheadedness, headache, blurred vision, neck pain, sore throat, chest pain, hemoptysis, fever, chills, nausea, vomiting, diarrhea, abdominal pain, hematemesis, hematochezia, melena, photophobia, or skin rash. (Tr. 487). Upon examination, Plaintiff was comfortable and did not complain of shortness of breath. (Tr. 487). Her monitor tracings were normal with no evidence of arrhythmia. (Tr. 487). Ultimately, Plaintiff was discharged that same day and instructed to follow up with her primary care physician as soon as possible. (Tr. 489).

An x-ray of Plaintiff's chest taken on April 16, 2005 revealed that her heart size was stable and within normal limts. (Tr. 506). No failure was noted and no acute confluent infiltrates were seen. (Tr. 506).

Dr. Deepak Pasi examined Plaintiff on June 28, 2005. (Tr. 510-511). On that date, Plaintiff complained of chest pain and heart flutter. (Tr. 510). However, Dr. Pasi noted that during a May

12, 2005 heart monitor, Plaintiff had no problems. (Tr. 510). Cardiovascular exam revealed normal first and second heart sounds. (Tr. 511). Plaintiff had no gallops, murmurs or clicks. (Tr. 511). In addition, Plaintiff's chest was clear to auscultation and percussion. (Tr. 511).

On July 19, 2005, Plaintiff was examined by Dr. Anthony G. Carraway. (Tr. 512-515). Plaintiff denied feeling hopeless and reported having good friendships. (Tr. 512). Her thoughts were logical, goal directed and well organized. (Tr. 513). No thought disorder was present. (Tr. 513). In addition, Plaintiff's intellectual level of functioning appeared to be average to low average. (Tr. 514). Dr. Carraway concluded that "[o]verall [Plaintiff's] ability to understand, retain, and perform instructions appears to be only minimally impaired." (Tr. 514). He also concluded that Plaintiff would be able to handle benefits in her best interested if she were awarded them. (Tr. 514).

Plaintiff's physical RFC was evaluated on July 12, 2005. (Tr. 516-523). It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday); and 5) push and/or pull with no limitations other than as shown for lifting and carrying. (Tr. 517). No postural, manipulative, visual or communicative limitations were noted. (Tr. 518-520). Plaintiff was instructed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 520). Otherwise, no environmental limitations were noted. (Tr. 520).

Dr. F.A. Breslin conducted a psychiatric review of Plaintiff on August 9, 2005. (Tr. 524-538). He determined that Plaintiff had: 1) mild restrictions of her activities of daily living; 2) mild difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence or pace; and 4) no episodes of decompensation of extended duration. (Tr. 534). In

13

addition, Dr. Breslin stated that Plaintiff was:  1) not significantly limited in her ability to remember locations and work-like procedures; 2) not significantly limited in her ability to understand and remember very short and simple instructions; 3) moderately limited in her ability to understand and remember detailed instructions; 4) not significantly limited in her ability to carry out very short and simple instructions; 5) moderately limited in her ability to carry out detailed instructions; 6) moderately  limited in her ability to maintain attention and concentration for extended periods; 7) moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 8) not significantly limited in her ability to sustain an ordinary routine without special supervision; 9) not significantly limited in her ability to work in coordination with or proximity to others without being distracted by them; 10) not significantly limited in her ability to make simple work-related decisions; 11) moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 12) not significantly limited in her ability to interact appropriately with the general public; 13) not significantly limited in her ability to ask simple questions or request assistance; 14) not significantly limited in her ability to accept instructions and respond appropriately to criticism from supervisors; 15) not significantly limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 16) not significantly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards or neatness and cleanliness; 17) moderately limited in her ability to respond appropriately to changes in the work setting; 18) not significantly limited in her ability to be aware of normal hazzards and take appropriate precautions; 19) not significantly limited in her ability to travel in unfamiliar places; and 20) not significantly

14

limited in her ability to set realistic goals or make plans independently of others. (Tr. 539-540).

During an October 3, 2005 examination, Plaintiff indicated that she walked half a mile every day. (Tr. 549).

On January 4, 2006, Dr. Renee Holloway determined that Plaintiff had: 1) mild restrictions of her activities of daily living; 2) mild difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence or pace; and 4) no episodes of decompensation of extended duration. (Tr. 560). She also stated that Plaintiff was: 1) not significantly limited in her ability to remember locations and work-like procedures; 2) not significantly limited in her ability to understand and remember very short and simple instructions; 3) moderately limited in her ability to understand and remember detailed instructions; 4) not significantly limited in her ability to carry out very short and simple instructions; 5) moderately limited in her ability to carry out detailed instructions; 6) moderately limited in her ability to maintain attention and concentration for extended periods; 7) moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 8) not significantly limited in her ability to sustain an ordinary routine without special supervision; 9) not significantly limited in her ability to work in coordination with or proximity to others without being distracted by them; 10) not significantly limited in her ability to make simple work-related decisions; 11) moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 12) not significantly limited in her ability to interact appropriately with the general public; 13) not significantly limited in her ability to ask simple questions or request assistance; 14) moderately limited in her ability to accept instructions and respond appropriately to

15

criticism from supervisors; 15) not significantly limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 16) not significantly limited in her ability to maintain socially appropriate behavior and to adhere to basic standards or neatness and cleanliness; 17) moderately limited in her ability to respond appropriately to changes in the work setting; 18) not significantly limited in her ability to be aware of normal hazzards and take appropriate precautions; 19) moderately limited in her ability to travel in unfamiliar places; and 20) not significantly limited in her ability to set realistic goals or make plans independently of others. (Tr. 566-567).

Plaintiff was examined by Dr. Joel Rapchik on January 15, 2006. (Tr. 564-565). Her lungs were clear to percussion and auscultation. (Tr. 564). In addition, her heart rhythm was regular, with no murmurs, gallops or rubs. (Tr. 564). She was able to get on and off the examination table as well as sit and lie down without significant difficulty. (Tr. 565). Likewise, Plaintiff ambulated normally and without difficulty. (Tr. 565). Finally, Plaintiff had full strength in her extremities. (Tr. 565).

On November 24, 2004 Dr. Willie Sessions stated that Plaintiff had fair exercise tolerance and no chest discomfort. (Tr. 650). A treadmill myocardial scan was negative for infarction or ischemia at submaximal exercise. (Tr. 651).

Dr. Clifford Wheeless examined Plaintiff on March 24, 2006. (Tr. 668). Her gait was normal, and her left knee flexed and extended well. (Tr. 668). Plaintiff underwent an injection of Triamcinolone. (Tr. 668). Plaintiff was examined again on August 18, 2006. (Tr. 667). As before, she ambulated normally and had a full range of motion in her left knee. (Tr. 667). After this examination Plaintiff underwent another Triamcinolone injection. (Tr. 667). On December 6, 2006, Plaintiff stated that this injection was helpful but that her knee pain had returned. (Tr. 666). Upon

examination, Plaintiff's gait was normal. (Tr. 666). Nonetheless, Plaintiff underwent another Triamcinolone injection. (Tr. 666). Thereafter, on April 11, 2007, Plaintiff reported with complaints of left knee pain and right hand carpal tunnel syndrome. (Tr. 664). During this examination, Dr. Wheeless stated that Plaintiff wanted to proceed with a left knee arthroscopy. (Tr. 664). On May 5, 2007, Dr. Wheeless stated Plaintiff had no complications during her left knee arthroscopy. (Tr. 660). Plaintiff was not in any pain on May 11, 2007. (Tr. 659). Moreover, Dr. Wheeless stated that "as regard to her right hand it is doing very well." (Tr. 659). Similarly, on May 18, 2007, Plaintiff reported that her hand was doing very well and she had no pain. (Tr. 658). In addition, Dr. Wheeless indicated that Plaintiff had full range of motion in her knee. (Tr. 658). Accordingly, Plaintiff was informed by Dr. Wheeless that she could return to work on light duty. (Tr. 658). However, on June 1, 2007 Plaintiff's knee became swollen and required aspiration. (Tr. 657). Despite this swelling, Plaintiff's knee still moved well. (Tr. 657). On June 8, 2007 Plaintiff complained of continuing pain in her left knee. (Tr. 656). Dr. Wheeless noted that Plaintiff's left knee extended well. (Tr. 656). Plaintiff also noted that her right hand carpal tunnel symptoms had diminished. (Tr. 656). Nonetheless, Dr. Clifford Wheeless opined that Plaintiff should be kept out of work . (Tr. 656).

The ALJ made the following finding with regard to Dr. Wheeless' May 5, 2007 opinion:

> The record includes a medical source statement which appears to be from Dr. Wheeless dated May 5, 2007 that indicates that claimant has no work capacity . . . The Administrative Law Judge gives no weight to that opinion since it is not adequately completed. Dr. Wheeless provided another treating medical source statement dated June 21, 2007 which indicates that the claimant was not to perform any work for one month. This statement is also incomplete in terms of identifying the claimant's abilities and limitations for specific work-related activities at the end of that month, and is, therefore, given little weight . . .
> (Tr. 28).

17

Plaintiff's ability to work was reviewed by Orthopaedic Specialists of North Carolina on July 20, 2007. (Tr. 673). The review indicated that Plaintiff's weight restriction was 15 pounds. (Tr. 673). Likewise, Plaintiff was limited to squatting, climbing, pushing, pulling or stooping for no more than two hours at a time. (Tr. 673). Ultimately, the report indicated that Plaintiff could return to light duty work on July 23, 2007. (Tr. 673).

A chest x-ray dated October 22, 2007 indicated that Plaintiff's heart size was normal and that her left lung was clear. (Tr. 698). There was a linear opacity at the right lung base, and there were mild degenerative changes in her lower thoracic spine. (Tr. 698).

On November 8, 2007, Kimberly Scott of Heritage Counseling Services, Inc. stated that "based on the severity, intensity, and duration of [Plaintiff's] symptoms, as well as the current life stressors . . . and persistent depressive/anxiety/PTSD, it will be difficult for [Plaintiff] to maintain appropriate level of functioning that could support consistent employment success." (Tr. 703). However, on July 17, 2007, Plaintiff's treatment records at Heritage Counseling Services indicate that one of Plaintiff's strengths was that she was good at her job.[2] (Tr. 713).

The ALJ made the following finding with regard to Ms. Scott's opinion:

> Ms. Scott has provided a treating medical source statement dated November 8, 2007 indicating that it would be difficult[] for the claimant to maintain consistent employment due to her mental conditions . . .Since the claimant has continued to work on a part-time basis since her alleged onset date and since she has been able to care for her grandchildren and maintain normal activities of daily living since that time, the Administrative Law Judge gives no weight to this opinion.
> (Tr. 28).

---

[2] Although the ALJ found that Plaintiff was not engaged in substantial gainful activity, he did note that Plaintiff was working as a part-time nurses aide. (Tr. 20).

During the hearing in this matter, Plaintiff testified that she was currently working part time as a nurses aide. (Tr. 777). In the course of her duties as a nurses aide, she stated that she would occasionally have panic attacks, but that she was able to get them under control without needing to leave. (Tr. 780, 782). Furthermore, Plaintiff stated that she still suffered pain in her hands resulting from her carpal tunnel syndrome. (Tr. 786). Plaintiff testified that she suffered asthma attacks two or three times a week. (Tr. 787). With regard to her left knee, she stated that her pain had worsened after she underwent the arthroscopy. (Tr. 789). Likewise, Plaintiff asserted that she has suffered back pain since 2002. (Tr. 791). Plaintiff indicated that she experienced depression two or three times a week. (Tr. 792). She also testified that she suffered from visual and auditory hallucinations. (Tr. 795). Similarly, she noted that she suffers from insomnia. (Tr. 796). Moreover, Plaintiff stated that she has never had a driver's license. (Tr. 797). She did assert that she could sit for about 35 or 40 minutes and stand for about 30 minutes without experiencing any pain. (Tr. 798).

With regard to Plaintiff's testimony, the ALJ made the following observations:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could be expected to produce the alleged symptoms but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible. The claimant has not developed any significant complications from her hypertension or her diabetes. She has not had frequent acute asthmatic attacks and she does not have any clinical signs of respiratory insufficiency related to her COPD. Pulmonary function studies reveal only moderate respiratory impairment. The claimant's carpal tunnel syndrome and her degenerative joint disease were corrected by surgery and she does not have any residual signs of inflammation, limitation of motion, joint deformity, or focal neurological deficits. The claimant has no functional limitations directly attributable to her obesity such as impairments in ambulation or in performing fine and gross manipulative activities. However, . . . the [ALJ] has considered the impact of claimant's obesity . . . at each step of the sequential adjudication process. In assessing the claimant's residual functional capacity, the Administrative Law Judge finds that claimant's obesity does not significantly increase the functional limitations related to her

19

other impairments . . . The claimant does not have any significant mental status abnormalities and she has been able to maintain activities of daily living and to work on a part-time basis regularly despite her mental conditions. She has been able to care for her grandchildren. She also has been able to keep regularly scheduled medical appointments independently. In addition, the medical evidence and observations by the Administrative Law Judge do not reveal any change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process. These factors indicate that the claimant's allegations of functional restrictions are not fully credible.

(Tr. 27).

Based on this evidence, the ALJ made the following findings regarding the severity of

Plaintiff's impairments:

The claimant's hypertension has not resulted in any of the complications described in Listings 4.02, 4.04, 2.02-2.04, 6.02, or 11.04. The claimant's diabetes has not resulted in neuropathy, acidosis, or retinitis proliferans which are required to meet Listing 9.08. The claimant's respiratory conditions do not meet the relevant criteria of Listing 3.03 since she does not have severe asthmatic attacks necessitating physician intervention occurring at least 6 times per year as required to meet Listing 3.03B and she does not have chronic asthmatic bronchitis as defined in Listing 3.03A with reference to Listing 3.02A. The claimant has not required continuing surgical management of her carpal tunnel syndrome as required for this condition to meet Listing 1.08. The claimant's degenerative joint disease has not resulted in an inability to ambulate effectively as required for this condition to meet Listing 1.02A. There are no Listing of Impairment criteria for obesity. However, the Administrative Law Judge has considered the impact of obesity . . .at each step of the sequential adjudication process.

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04 or 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. . . .

The medical record reveals that the claimant's thought processes are within normal limits. She is anxious and depressed but her appearance is appropriate and she has been noted to be pleasant and cooperative. She does not exhibit any psychomotor abnormalities. She has episodic social isolation. Therefore, the Administrative Law Judge finds that, in activities of daily living, the claimant has mild restriction. In social functioning, the claimant

has moderate difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation. Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied. . . .

The claimant's conditions are not manifested by other clinical findings indicating a level of severity comparable to the criteria of the relevant Listings, and therefore, her conditions can not be found to medically equal the criteria of the Listing of Impairments.
(Tr. 21-22).

In addition, the ALJ made the following finding with regard to Plaintiff's RFC:

The claimant can sit for 6 hours in an 8-hour day. She can stand and walk for up to 6 hours total in an 8-hour day. She can lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently. She can perform tasks requiring fingering and handling frequently. She can perform tasks requiring stooping, crouching, kneeling, or crawling frequently. She is not able to perform any tasks requiring balancing or climbing or tasks that require any exposure to hazards such as unprotected heights or dangerous machinery. She is not able to perform tasks that require working in environments with respiratory irritants such as dust, fumes or smoke. She has a decreased ability to concentrate on and attend to work tasks to the extent that she can perform only simply, routine, repetitive tasks. She is able to interact with co-workers occasionally. She is not able to perform tasks requiring any interaction with the general public. She is not able to work at a production rate. She is also unable to work at jobs requiring complex decision making, constant change, or dealing with crisis situations.
(Tr. 22).

A VE also testified at the hearing in this matter. (Tr. 801-805). She testified that would be able to perform the requirements of the following occupations: 1) cleaner, housekeeping; 2) sorter; and 3) photocopy machine operator. (Tr. 803). The VE also indicated that these jobs existed in significant numbers in the national economy. (Tr. 803). Finally, the VE stated that her testimony was consistent with the Dictionary of Occupational Titles. (Tr. 803). The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Plaintiff's assignments of

error shall now be addressed in turn.

## The ALJ did not err in evaluating Plaintiff's RFC

Plaintiff claims that the ALJ erred by failing to abide by SSR 96-8p, which requires the ALJ to "include a narrative discussion describing how the evidence supports each conclusion." This assertion is simply inaccurate. Contrary to Plaintiff's argument, the ALJ engaged in a lengthy discussion of the evidence which supported his RFC determination. (Tr. 20-28). Moreover, that determination was supported by the substantial evidence that was summarized, *supra*.

This assignment of error essentially highlights evidence the ALJ allegedly "failed" to consider. Plaintiff asks this Court to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of Defendant's. The undersigned declines to do so. Because there is substantial evidence in the record to support the ALJ's RFC determination, this assignment of error is without merit.

## The ALJ accorded proper weight to Plaintiff's treating physician

Plaintiff argues that the ALJ did not properly assess the opinions of Plaintiff's treating physicians. It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245 (Slip Op. at 8)(W.D.Va. 2006)(internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." Id. (internal citations omitted).

While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling

weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4th Cir.1999) (unpublished opinion)(internal citations omitted).

In his decision, the ALJ fully explained his reasoning in weighing the medical evidence. These reasons were supported by substantial evidence and, therefore, this assignment of error is also meritless.

### The VE's testimony was consistent with the Dictionary of Occupational Titles

During a hearing, a VE utilizes his or her expertise to assist the ALJ in determining whether there is work in the national economy that a claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "there is an apparent unresolved conflict between [vocational expert] evidence and the [Dictionary of Occupational Titles], the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled.'" Fisher, 181 Fed. Appx. at 365. To that end, the ALJ must "inquire, on the record, as to whether there is such consistency." Id. Neither the DOT nor the vocational expert's testimony will automatically trump when there is a

conflict.  Id.  Instead, the ALJ must resolve the conflict by determining whether the vocational expert's explanation is reasonable.  Id.  Examples of reasonable explanations can involve testimony that is based on "other reliable publications" or the vocational expert's own "experience in job placement or career counseling."  Id.  In addition, because the DOT "lists maximum requirements of occupations as generally performed, not the range of requirements as it is performed in a specific setting,"  the vocational expert "may be able to provide more specific information about jobs or occupations than the DOT."

In this case, the VE testified that her determination was consistent with the DOT.  (Tr. 803).  Thus, the ALJ was not required to elicit a "reasonable explanation" from the VE.  Jones v. Astrue, 2009 WL 455414, * 23 (E.D.N.C. February 23, 2009).  Moreover, the VE was not cross-examined on this specific finding.  (Tr. 803-804).  Rather, she was asked, *inter alia*, if her determination "[w]ould change if the claimant was limited with lifting only 15 pounds." (Tr. 803).  Thus, Plaintiff is essentially using this assignment of error to re-argue that the ALJ's RFC determination was incorrect.  However, the hypothetical question posed to the VE by the ALJ was based on a RFC determination supported by substantial evidence.  Therefore, it accurately reflected all of Plaintiff's limitations.

Moreover, Plaintiff has attached relevant DOT entries to her memorandum in support and these entries have been reviewed by the undersigned. [DE-20].  Plaintiff first argues that the VE's determinations with regard to the positions of "cleaner, housekeeping" and "photocopy machine operator" are inconsistent with the DOT because they require interaction with the general public.  However, the DOT entry for both of these positions indicates that: 1) interaction with "people" will be "not significant"; and 2) the requirement to talk to others is "not present." [DE-20].  Likewise,

Plaintiff argues that the VE's determination with regard to the position of "mail sorter" is inconsistent with the DOT because it requires a reasoning level of three. First, the undersigned notes that the previous discussed positions of "cleaner, housekeeping" and "photocopy machine operator" have reasoning levels which Plaintiff ostensibly concedes are appropriate for her RFC. (Pl. Mem. DE-20, pg. 10). Both of these positions exist in significant numbers in the national economy (Tr. 803), and thus the remainder of Plaintiff's argument is inapposite. Jones v. Astrue, 2009 WL 455414, * 23 (E.D.N.C. February 23, 2009). Specifically, this Court has stated:

> The VE testified also that Claimant could perform the job of mail clerk, a position which carries a reasoning level of 3. (R.441). Courts addressing the issue of a conflict between the VE testimony and the DOT have found that the limitation to simple and routine and repetitive tasks is inconsistent with a reasoning level of 3, and that error is committed where the ALJ relies upon the VE testimony without further explanation. See Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir.2005); see also Riggs, 2008 WL 1927337, at *15. This Court however need not address whether error was committed. Here, even if this Court were to determine that the ALJ erred in this respect, such error is harmless considering the ALJ relied appropriately upon the VE's unconflicted testimony regarding positions with a reasoning level of 2. See Riggs, 2008 WL 1927337, at *20 (no step-five error where there was no inconsistency between jobs identified by the VE and adopted by the ALJ requiring level 2 reasoning and limitations to simple instructions and decisions).
> Jones v. Astrue, 2009 WL 455414, * 23 (E.D.N.C. February 23, 2009).

Accordingly, this assignment of error is meritless

**Conclusion**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings [DE-19] be DENIED, that Defendant's Motion for Judgment on the Pleadings [DE-22] be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 4th day of September, 2009.

_____
William A. Webb
U.S. Magistrate Judge